**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

| | |
|---|---|
| PETER J. VOGGENTHALER, et al., ) <br> ) <br> Plaintiffs, ) <br> ) <br> v. ) <br> ) <br> MARYLAND SQUARE, LLC, et al., ) <br> ) <br> Defendants. ) <br> _____ ) <br> MARYLAND SQUARE, LLC, et al., ) <br> ) <br> Third Party Plaintiffs, ) <br> ) <br> v. ) <br> ) <br> GENERAL GROWTH MANAGEMENT, INC., ) <br> a foreign corporation, et al. ) <br> ) <br> Third Party Defendants. ) <br> _____ ) | 2:08-CV-1618-RCJ-GWF <br><br> **ORDER** |

Currently before the Court is Plaintiffs' Motion for Summary Judgment (#164) filed on October 20, 2009. Defendants filed a Supplemental Opposition to Motion for Summary Judgment (#343) on June 22, 2010, and Plaintiffs filed a Supplemental Reply (#366) on June 29, 2010.

The Court heard oral argument on the motion on July 6, 2010.

**BACKGROUND**

Plaintiffs, all of whom are residential homeowners, filed the complaint in this action on November 19, 2008. Plaintiffs' claims arise out of ground water contamination caused by the discharge of perchloreoethylene ("PCE") from an Al Philips the Cleaners dry cleaning facility

that was located in the Maryland Square Shopping Center ("Shopping Center") from 1969 until 2000. The Shopping Center is located at 3651 through 3681 South Maryland Parkway, in Las Vegas, Nevada. The Shopping Center has been owned by five different entities since 1968, all named as Defendants in the present suit. Defendant Herman Kishner, doing business as Maryland Square Shopping Center, was owner of the Shopping Center in 1968. The Herman Kishner Trust, created in 1969 by defendant Herman Kishner, is the successor-in-interest to defendant Herman Kishner with respect to the Shopping Center. Defendant Maryland Square Shopping Center Limited Liability Company is a limited liability company organized under the laws of Nevada and is the successor-in-interest to the Herman Kishner Trust with respect to the Shopping Center. In 2002, the Clark County School District purchased the Shopping Center from defendant Maryland Square Shopping Center Limited Liability Company. In 2005, defendant Maryland Square LLC purchased the Shopping Center from the Clark County School District and is the current owner of the Shopping Center.

An Al Philips the Cleaners dry cleaning facility was operated in the Shopping Center from 1969 to 2000 and was operated by two different entities, also named as Defendants. Defendant Shapiro Brothers Investment Company ("Shapiro Brothers") is a dissolved Nevada corporation that operated the dry cleaning facility at the Shopping Center from approximately 1968 through 1984. Shapiro Brothers leased the dry cleaning facility from the owner. In 1984, Johnson Group, Inc., the predecessor of DCI USA, Inc. (collectively referred to herein as the "DCI Defendants") purchased the dry cleaning business from the Shapiro Brothers. DCI operated a dry cleaning facility at the site until approximately 2000, and leased the site until approximately 2003.

The Shopping Center, which is now partly closed and demolished, is located on the westside of Maryland Parkway, a major north-south street in the south-central portion of the Las Vegas metropolitan area. The Boulevard Mall is located on the eastside of Maryland Parkway. Plaintiffs' homes are in a residential neighborhood located on the east side of the Boulevard Mall. The PCE discharged from the Al Philips facility allegedly developed into an
///

underground "plume" which migrated eastward beneath the Boulevard Mall and eventually beneath Plaintiffs' residential neighborhood.

This lawsuit arose from an investigation that was overseen by the Nevada Division of Environmental Protection ("NDEP"). PCE is a solvent/degreaser commonly used in dry cleaning operations. According to NDEP investigation reports, the PCE discharge at the Al Philips facility was first reported on November 29, 2000 during a routine environmental inspection performed as part of a property transaction. NDEP received an initial environmental report regarding the discharge on July 21, 2001. It was not known when the release of PCE into the ground at the Al Philips facility began. In late 2002, it was determined that PCE had migrated off site, forming a "plume" in the groundwater. Test results from monitoring wells on the Boulevard Mall property in 2003 and 2004 showed that the PCE plume had traveled due east beneath the property. A July 2005 report indicated that the PCE plume had extended further east under the residential neighborhood. This was confirmed in 2006 by test results from monitoring wells installed in the residential neighborhoods.

In October 2006, NDEP staff met with and directed it to (1) conduct soil vapor sampling in the residential neighborhood, (2) prepare a detailed investigation and plan for removal of the contaminant at the dry cleaner site, (3) prepare a groundwater corrective action plan, and (4) perform further characterization of off-site groundwater contamination. DCI agreed to complete an investigation and recommendations for soil cleanup at the Al Philips facility and to conduct soil gas sampling in the neighborhood. A soil gas report was submitted to NDEP in April 2007. Computer simulations based on the data in this report indicated a potential for vapor intrusion into the homes in the area. At oral argument, NDEP informed that Court that it had already ordered exhaust fans be placed in some of the homes to address the immediate problem.

In April 2007, NDEP notified DCI that it intended to move forward with further investigation and mitigation and would seek reimbursement from DCI and other potentially responsible parties. NDEP thereafter notified potentially responsible parties about its intention to address the area affected by the spill and to require additional site assessment work and

corrective action. NDEP allegedly notified the Maryland Square Defendants and DCI of its intentions on June 19, 2007. Beginning in August 2007 and continuing into early 2008, NDEP also notified residents, property owners, and local government officials of the PCE contamination in ground water under the neighborhood and possible long-term health effects. In 2008, NDEP notified the Maryland Square Defendants that it had expended approximately $160,000 to determine whether the PCE posed "a potential human exposure" in the residential neighborhood, that NDEP intended to expend additional state funds to address human exposures to PCE, and that NDEP would seek recovery of its expenses from the parties determined to be responsible for the release of contaminants from the Al Philips facility.[1]

As noted, Plaintiffs filed this action under the RCRA, 42 U.S.C. § 6972(a)(1)(B), on November 19, 2008. Plaintiffs seek a judgment requiring Defendants to take such action as may be necessary to address and abate the contamination at the site. Plaintiffs also request an award of cost of litigation including reasonable attorneys' fees and expert fees, including future fees to monitor Defendants' compliance with any orders or judgments issued by the Court.

Now before the Court is Plaintiffs' Motion for Summary Judgment (#164).

## DISCUSSION

### I. Motion for Summary Judgment

#### A. Legal Standard for Summary Judgment

The purpose of summary judgment is to avoid unnecessary trials when there is no dispute as to the material facts before the court. Nw. Motorcycle Ass'n v. U.S. Dep't of Agric., 18 F.3d 1468, 1471 (9th Cir. 1994). Summary judgment is proper if the evidence shows that there is no genuine issue as to any material fact and the moving party is entitled to judgment

---

[1] NDEP filed a civil action against the Maryland Square Defendants and the Shapiro Defendants in this District on May 4, 2009, to recover the past and future costs incurred in investigating and mitigating the PCE contamination pursuant to CERCLA, 42 U.S.C. § 9607(a)(4) and Nevada statutory provisions, including NRS 459.537. See NDEP v. Maryland Square Shopping Center, et al., Case No. 3:09-cv-00231-RCJ-VPC. NDEP's complaint also seeks injunctive relief under NRS 445A.695 to require Defendants to complete an assessment of the extent and magnitude of the contamination resulting from releases from the Al Philips facility, to submit timely reports, to submit and implement a corrective action plan. (NDEP Complaint (#1)).

4

as a matter of law. Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). Where reasonable minds could differ on the material facts at issue, summary judgment is not appropriate. Warren v. City of Carlsbad, 58 F.3d 439, 441 (9th Cir. 1995). As summary judgment allows a court to dispose of factually unsupported claims, the court construes the evidence in the light most favorable to the nonmoving party. Bagdadi v. Nazari, 84 F.3d 1194, 1197 (9th Cir. 1996).

In evaluating the appropriateness of summary judgment, three steps are necessary: (1) determining whether a fact is material; (2) determining whether there is a genuine issue for the trier of fact, as determined by the documents submitted to the court; and (3) considering that evidence in light of the appropriate standard of proof. Id. As to materiality, only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes which are irrelevant or unnecessary will not be considered. Id. Where there is a complete failure of proof concerning an essential element of the nonmoving party's case, all other facts are rendered immaterial, and the moving party is entitled to judgment as a matter of law. Celotex, 477 U.S. at 323. Summary judgment is not a disfavored procedural shortcut, but an integral part of the federal rules as a whole. Id.

**B. Injunctive Relief under 42 U.S.C. § 6972**

Plaintiffs seek summary judgment on their cause of action asserted under RCRA, 42 U.S.C. § 6972(a)(1)(B). This statute provides for suits against any party "who has contributed or who is contributing to the past or present handling, storage, treatment, transportation, or disposal of any solid or hazardous waste *which may present* an imminent and substantial endangerment to health or the environment." 42 U.S.C. § 6972(a)(1)(B) (emphasis added). "RCRA's primary purpose . . . is to reduce the generation of hazardous waste and to ensure the proper treatment, storage, and disposal of that waste which is nonetheless generated, 'so as to minimize the present and future threat to human health and the environment.'" Meghrig v. KFC W., Inc., 516 U.S. 479, 483, 116 S.Ct. 1251 (1996)(quoting 42 U.S.C. § 6902(b)). The statute permits a private citizen to seek an injunction "that orders a responsible party to 'take

5

action' by attending to the cleanup and proper disposal of toxic waste." Id. at 484 (quoting 42 U.S.C. § 6972 (a)(1)(B)).

To establish liability under section 6972(a)(1)(B), a plaintiff must establish three elements: (1) That the endangerment stems from the handling, storage, treatment, transportation or disposal of any solid or hazardous waste; (2) That the defendant has contributed or is contributing to such handling, storage, treatment, transportation or disposal; and (3) That the conditions at the site may present an imminent and substantial endangerment. United States v. Bliss, 667 F. Supp. 1298, 1313 (E.D. Mo. 1987); see also Lincoln Props., Ltd. v. Higgins, 1993 WL 217429 (E.D. Cal. 1993).

According to Plaintiffs, there is no genuine issue of fact as to any of the foregoing elements, and Defendants are liable as a matter of law. Plaintiffs state that Defendants have been aware of the contamination for at least ten years, but have "not commenced one iota of remedial activity during this period despite the continued migration of the plume of hazardous waste and the numerous ignored directives from [NDEP] to take action." (Plaintiffs' Supplemental Reply (#366) at 5). According to Plaintiffs, "[a]fter more than a decade, it is time for this Court to take strong and immediate action," and issue an injunction against Defendants requiring them to immediately clean-up the contamination plume. Id.

**1. Hazardous Waste**

Section 6972(a)(1)(B) restricts the disposal of a "solid or hazardous waste." The statute defines the term hazardous waste:

> (5) The term "hazardous waste" means a solid waste, or combination of solid wastes, which because of its quantity, concentration, or physical, chemical, or infectious characteristics may -
> (A) cause, or significantly contribute to an increase in mortality or an increase in serious irreversible, or incapacitating reversible, illness; or
> (B) pose a substantial present or potential hazard to human health or the environment when improperly treated, stored, transported, or disposed of, or otherwise managed.

42 U.S.C. § 6903(a)(5). "The Environmental Protection Agency has determined that PCE and TCE are 'hazardous wastes' under RCRA." Lincoln, 1993 WL 217429 at *14; see also 40 C.F.R. § 261.31 (listing PCE as a solid waste classified as a hazardous waste).

6

Defendants do not dispute that PCE is classified as a hazardous waste and there is no genuine issue of material fact as to PCE's classification.

### 2. Contribution to the Handling, Storage, Treatment, Transportation, or Disposal of the Hazardous Waste

In order to grant summary judgment, Plaintiffs must establish that Defendants have contributed or are contributing to the handling, storage, treatment, transportation or disposal of the hazardous waste that created the endangerment. 42 U.S.C. § 6972(a)(1)(B). Plaintiffs argue that there is indisputable evidence that the dry cleaning facility at the Shopping Center used PCE in its operations. (Motion for Summary Judgment (#164) at 7). Plaintiffs state that Defendants, as owners of the Shopping Center, contributed to the handling and disposal of PCE because they profited from the operations of the dry cleaning facility. Id. at 8. Plaintiffs state that they are not obligated to prove that the Maryland Square Defendants actually caused the contamination, rather, that "there is a logical nexus between the leasing of the Site for the operation of a dry cleaning facility and the related handling and disposal of PCE." Id. Plaintiffs allege that this nexus exists because under the lease agreement entered into between The Herman Kishner Trust and Shapiro Bros. Investment Corp., dba Al Philips the Cleaners dated November 18, 1982, the dry cleaner was to pay the Maryland Square property owner "a minimum annual rent of $30,000, plus additional rent in the amount of six percent (6%) of the gross sales derived from the dry cleaner's over-the-counter dry cleaning business." (Plaintiffs' Supplemental Reply (#366) at 15-16). Because Defendants were entitled to 6% of the gross sales derived from the dry cleaning operations, Plaintiffs state that Defendants are "direct participant[s] in the financial operation of the dry cleaner's business" and profited financially from the dry cleaner's use of PCE. Id. In addition, Plaintiffs argue that Defendants are liable for having contributed to the handling or disposal of PCE because Defendants owned and operated the below-ground drain pipes and drain lines beneath the dry cleaning facility. According to Plaintiffs, the contamination was at its highest concentration in the process drain lines beneath the concrete slab of the suite leased to the dry cleaner. Id. at 17.

In response, Defendants argue that there is a question of fact regarding whether they contributed to the handling and disposal of PCE. Defendants state that Plaintiffs have provided no evidence that Defendants did "anything beyond leasing the property to the Shapiro Defendants to operate a dry cleaner." (Supplemental Opposition to Motion for Summary Judgment (#343) at 7). Defendants assert that: "No allegations are made that Defendants were owners of the dry cleaning business itself; owned any of the equipment used; had any involvement, oversight, or management of the dry cleaning operations; or were negligent in their decision to allow a dry cleaner operation at the Maryland Square Shopping Center." Id. Rather, Defendants state that Plaintiffs have only established that Defendants' played a "passive" role in the contamination at the site. Id.

"The RCRA does not define the term 'contribute' or any variation thereof."[2] See Cox v. City of Dallas, 256 F.3d 281, 294 (5th Cir. 2001). "This silence compels us to 'start with the assumption that the legislative purpose is expressed by the ordinary meaning of the words used." Id. (quoting Russello v. United States, 464 U.S. 16, 21, 104 S.Ct. 296 (1983)); see also Interfaith Cmty. Org. v. Honeywel l Int'l, Inc., 263 F. Supp.2d 796, 844 (D.N.J. 2003)("The Supreme Court of the United States has instructed that the intent of Congress is to be determined by the plain language of a statute and, absent an indication from Congress to the contrary, words in a statute are to be given their 'ordinary contemporary, common meaning.'").

Webster's Dictionary defines "contribute" as to "have a share in any act or effect." Id. (quoting Webster's Third New International Dictionary 496 (unabridged)(1963)); see also Oxford English Dictionary 849 (2d ed. 1989)("to have a part or share in producing [an effect]"); The American Heritage Dictionary of the English Language 410 (3d ed. 1992)("to help bring about a result").

In addition to looking at the plain language, courts have held that the term contribute is to be interpreted broadly, rather than narrowly. See, e.g., United States v. Aceto Agric. Chems. Corp., 872 F.2d 1373, 1383 (8th Cir. 1989)("The relevant legislative history supports

---

[2] The Ninth Circuit also has not defined the meaning of the term "contribute" under the RCRA. However, it has been discussed by other Circuits and district courts.

a broad, rather than narrow, construction of the phrase 'contributed to.'"); United States v. Waste Indus., Inc., 734 F.2d 159, 167 (4th Cir. 1984)("Congress's intent, then was to establish a standard of liability by incorporating and expanding upon the common law.").

In interpreting the term "contribute," courts have held that "[i]ndividuals are liable under RCRA without regard to fault or negligence." Zands v. Nelson, 797 F. Supp. 805, 809 (S.D. Cal. 1992)(citing United States v. Hardage, 18 E.R.C. 1685, 1686 (W.D.Ok. 1982)("It would be improper to read a negligence standard into the statute, not only because of the plain language of the statute but because of the hazardous nature of the activity.")). "The contributed to language, however, has been held to expressly specify that there is no liability without a causal relationship between a defendant and an imminent and substantial endangerment." Id. (internal quotations and citations omitted); see also Steilacoom Lake Imp. Club Inc. v. Wash., 138 Fed. Appx. 929, 933 (9th Cir. 2005)(unpublished opinion)(holding that a causal link is necessary to show that the party actually contributed to the concentration of hazardous waste that is deemed harmful).

Defendants argue that as mere owners of the Shopping Center, they cannot be liable for contributing to the disposal and handling of hazardous waste because there is no causal link between them and any potential harm caused by the PCE. Defendants state that there role was "purely passive," thereby negating liability under this element. Plaintiffs, on the other hand, state that the lease agreement providing Defendants with a percentage of the dry-cleaner's business, as well as Defendants' ownership of the drain pipes and drain lines beneath the facility is sufficient to hold Defendants liable for contributing to the disposal and handling of the PCE.

The Ninth Circuit has never addressed whether an owner of a contaminated site is liable under the RCRA for contributing to the contamination through passive behavior. In Honeywell, the New Jersey District Court held that under "a straightforward reading of RCRA . . . only *active* human involvement with the waste is subject to liability . . . ." 263 F. Supp. 2d at 844. Looking at the ordinary meaning of the word contribute, the court stated that "Congress intended to impose liability only where a person is shown to have affirmatively

9

acted as a determining factor over the waste management activities listed" in the statute. Id. That court held that the legislative history of the act also supported the conclusion that Congress intended the statute to reach only persons "engaged in the active management of waste." Id. In that regard, Congress stated that there was a long-standing view that "generators and other persons *involved* in the handling . . . disposal of hazardous wastes must share in the responsibility for the abatement of the hazards arising from *their activities*." Id. Thus, the court held that in order to impose RCRA liability, a plaintiff must show that a defendant actively engaged in the management or disposal of hazardous waste, and cannot rely upon evidence that a defendant merely displayed an alleged "studied indifference" to contamination. Id. at 846.

In First San Diego Props. v. Exxon Co., a California district court found that property owners who purchased property after it was contaminated and were not involved at the site during the actual contamination were not liable under the RCRA. 859 F. Supp. 1313, 1315-16 (S.D. Cal. 1994). In that case, plaintiffs purchased property that had previously been used as a gas station. After they purchased the property, plaintiffs became aware that it was contaminated but took no steps to mitigate or remediate the harm. The court held that the plaintiffs could not be liable for contributing to the hazardous waste because they added no new contaminates to the site. Id. at 1316. In addition, the court held that it would not hold plaintiffs liable for their passive inaction as a subsequent purchaser under the RCRA. Id.

In Steilacoom Lake, the Ninth Circuit, in an unpublished opinion, found that ownership of property alone was not sufficient to hold a property owner liable under the RCRA. 138 Fed. Appx. at 933. In that case, plaintiffs filed suit under the RCRA and the Clean Water Act against defendants after it was discovered that an artificial lake had an over-abundance of phosphorus, which prevented the lake from meeting state water quality standards. Defendants all owned property in the lake's watershed. The court held that it could not find defendants liable under the RCRA because the "causal evidence necessary for a reasonable jury to link defendants to the water quality problems of [the lake] is missing." Id. at 931. Specifically, plaintiffs did not submit evidence that "defendants, individually or collectively,

caused the increased phosphorous levels in the lake and thereby caused the lake's problems from which appellants claim injury." Id. According to the court: "The defendants' mere ownership of property in the lake watershed is not alone sufficient to meet the definition of 'disposal.'" Id. at 933.

In Zands v. Nelson, a California district court did, however, find a property owner liable under RCRA for contamination on land which had been used for a gasoline station. 797 F. Supp. 805 (S.D. Cal. 1992). According to the court, using the liberal interpretation of contribution, "the Court holds that owners and operators [of the gas station site] contributed to the contamination if the contamination is the direct result of activities related to the operation of a gas station." Id. at 810. The court stated that "[c]learly, individuals who own or operate gas stations are responsible for gasoline that leaks from the piping system or the gas tanks themselves. Indeed, the direct relationship between the leakage and the equipment owned and operated for use at the gas station is sufficient to prove the element of 'contribution.'" Id. The court went on to state that "this interpretation [of liability] is consistent with the purposes of a statute that imposes strict liability." Id. "Indeed, this interpretation does no more than hold defendants responsible for gasoline that would not have been brought onto the property but for the presence of a gas station." Id. Moreover, the court held that "individuals who own and operate gas stations benefit financially from their gas stations, they should be held responsible and accountable for injury to the environment that would not have happened without the presence of their gasoline-related activities." Id.

In this matter, the Court finds that Plaintiffs' have shown that Defendants "contributed" to the disposal and handling of PCE at the Shopping Center. Plaintiffs have provided evidence that Defendants' ownership was not merely passive, but that Defendants actively engaged in the management and/or disposal of hazardous waste at the site. There is no dispute that Defendants were all owners or prior owners of the Shopping Center and leased space to a dry cleaning facility that used PCE. Moreover, Plaintiffs have shown a causal link between Defendants as owners, and the contamination to the site because Defendants owned the drain pipes beneath the dry cleaning facility where the highest concentrations of PCE were

11

found.  In cases where property owners have been found liable under RCRA, the property owner also owned equipment at the site where the contamination occurred.  See Zands, 797 F. Supp. at 808.  In this case, Plaintiffs have provided evidence that Defendants, as owners of the Shopping Center, also owned the drainage features found beneath the dry cleaning facility.   In addition, Plaintiffs have shown a causal connection between Defendants and the contamination because Defendants gained a financial advantage by leasing the site to the dry cleaning tenants.  In this regard, not only were Defendants entitled to annual rent, but they also received a percentage of the dry cleaning operation's over-the-counter sales.  As noted by Plaintiffs, this makes Defendants a participant in the financial operation of the dry cleaning business and Defendants profited directly from the dry cleaner's use of PCE.

As such, there is no genuine issue of fact on this issue and the Court finds that Defendants contributed to the handling and disposal of the PCE.

### 3. Imminent and Substantial Threat

In order to be entitled to an injunction under 42 U.S.C. § 6972(a)(1)(B), Plaintiffs must establish that the conditions at the site present or may present an imminent and substantial endangerment to health or the environment.  Plaintiffs argue that they have satisfied this element because the PCE is already in the homes of the Plaintiffs, and such a presence meets the burden of demonstrating the imminence of the potential harm.  (Plaintiffs' Supplemental Reply (#366) at 21).  In addition, Plaintiffs argue that they have shown that the soil contamination from the PCE poses an imminent threat to the groundwater, and that the PCE vapors pose an imminent threat to human health.

In analyzing this element, courts have given the language of the statute an expansive interpretation.  First, courts note that the language of the statute includes the word "may" before the standard of liability.  Lincoln, 1993 WL 217429 * 13 (E.D. Cal. 1993).  According to a California district court, "[t]his is expansive language, which is intended to confer upon the courts the authority to grant affirmative equitable relief to the extent necessary to eliminate *any risk* posed by toxic wastes."  Id. (internal quotations and citations omitted).  As such, a plaintiff "need only demonstrate a measurable potential risk of harm." Fairway Shoppes Joint

Venture v. Dryclean U.S.A., 1996 WL 924705 *7 (S.D. Fla. 1996).

Second, the term "endangerment" means "a threatened or potential harm and does not require proof of actual harm." Lincoln, 1993 WL 217429 at *12. According to one court: "When one is endangered, harm is *threatened*; no actual injury need ever occur." Id. (quoting Ethyl Corp. v. Envtl. Prot. Agency, 541 F.2d 1, 13 (D.C.Cir. 1976)).

Third, "a finding of 'imminence' does not require a showing that actual harm will occur immediately so long as the risk of threatened harm is present." Id. "An endangerment is 'imminent' if the factors giving rise to it are present, even though the harm may not be realized for years." Id.

Finally, "the word 'substantial' does not require quantification of the endangerment (e.g., proof that a certain number of persons will be exposed, that 'excess deaths' will occur, or that a water supply will be contaminated to a specific degree.") Id. at 13. Instead, the "decisional precedent demonstrates that an endangerment is substantial if there is some reasonable cause for concern that someone or something may be exposed to a risk of harm by release or a threatened release of a hazardous substance if remedial action is not taken." Id.

Although the statute should be given an expansive reading when determining whether there is a risk of imminent and substantial endangerment, "injunctive relief should not be granted 'where the risk of harm is remote in time, completely speculative in nature, or *de minimis* in degree." Id. (quoting United States v. Reilly Tar & Chem. Corp., 546 F. Supp. 1100, 1109 (D. Minn. 1982)).

Here, the parties dispute whether the evidence shows that the contamination at the site presents an imminent and substantial threat of harm. Both sides have presented expert affidavits on this point. Plaintiffs' expert, Peter Krasnoff ("Krasnoff"), provided the following facts: (1) the investigations have revealed the presence of a plume of groundwater containing PCE emanating at the site and extending eastward into the residential neighborhoods; (2) the PCE concentrations in the groundwater plume exceed the maximum contaminant level for PCE as set by the United States Environmental Protection Agency; (3) the PCE in the

13

groundwater has volatized into soil gas, i.e., the voids present between the soil particles beneath the homes in the residential neighborhood; (4) the PCE in soil gas is present at levels that pose a threat to human health; and (5) the PCE in the soil gas has and continues to migrate into indoor air of residents located above the groundwater plume.  (Decl. of Peter Krasnoff (#164) at ¶¶ 9-11).  As a result of the foregoing, Krasnoff opined that the Plaintiffs' residential properties "are threatened by the plume of groundwater containing PCE."  Id. at ¶ 13.

Defendants' expert, Robert A. Howe ("Howe") on the other hand, declares that the PCE in groundwater beneath the site does not pose an imminent and substantial threat to human health and the environment.  (Decl. of Robert A. Howe (#348) at p. 4).  Howe states that a "stable dissolved-phase plume of [PCE] is present in the shallow nuisance aquifer present beneath the area down gradient of the Maryland Square mall and Boulevard mall located in Las Vegas, Nevada."  Id. at p. 4, ¶ 9.  According to Howe, the dissolved PCE plumes from the site do "not pose a threat to human health or the environment through ingestion or direct contact."  Id. at p. 4, ¶ 10. Howe states that the shallow aquifer is not potable and is vertically isolated from any potable water source in the area.  Id.  Howe further states that "there are no domestic water supply wells currently in use that are located near the regional PCE plume located in the area."  Id. at p. 5, ¶ 12. Howe notes that there is an irrigation well which services a down gradient golf course that has been impacted, but states that the reported concentrations in 2006 were below the EPA's Maximum Contaminant Level ("MCL") for PCE of 5 micrograms per liter.  Id.  Howe further declares that concentrations of PCE at the site "are generally low," and are "below those levels that would impact groundwater at concentrations that could result in unacceptable concentrations in vapors that might impact residences and industrial workers."  Id. at p. 5, ¶ 13.  Based on his review of the site, Howe states that "there is no reason to believe that PCE contaminated shallow groundwater present beneath the area will migrate to where contamination could impact human health and the environment."  Id. at p. 7, ¶ 18. As can be seen, Defendants argue that there is a question of

///

14

material fact whether the PCE contamination poses an imminent and substantial endangerment to health and the environment.

### a. Environment

Upon review of the evidence submitted and argument of the parties, the Court finds that the contamination at the site poses an imminent and substantial risk of harm to the environment.

In Fairway Shoppes, the court held that "[t]he presence of excessive levels of [PCE] in the groundwater . . . establishes an imminent and substantial endangerment to the environment, independent of whether the release of the dry cleaning chemicals may pose a threat to the public health." 1996 WL 924705 *8. The RCRA does not define the term "environment." However, "it presumably encompasses the air, soil and water, including groundwater." Lincoln, 1993 WL 217429 *13. As noted, Plaintiffs' expert stated that the PCE concentrations in the groundwater plume exceed the maximum contaminant level for PCE as set by the EPA. Defendants' expert also notes that there are concentrations of PCE in the groundwater. In Lincoln, the court held that the environment was degraded significantly by the contaminants' invasion of the water table. Id. Moreover, that court found it significant that the plume was unstable and had migrated "and may continue to migrate." Id. According to the court, "[t]his movement presents a threat of further endangerment to the environment." Id.

In this case, because there is a plume of PCE contamination in a groundwater aquifer that is migrating toward residential property, the Court finds, as a matter of law, that the contamination poses an imminent and substantial endangerment to the environment.

### b. Human Health

In addition, the Court finds that the contamination at the site poses an imminent and substantial risk of harm to health. Plaintiffs correctly note that Defendants' interpretation of the language of the statute is too restrictive when analyzing whether the contamination plume poses an imminent and substantial endangerment to health. Defendants assert that there is only an imminent and substantial danger "if there is a reasonable cause for concern that

someone or something may be exposed to a risk of harm if remedial action is not taken." (Supplemental Opposition (#343) at 10). According to Defendants, "[a]ny alleged endangerment must be substantial or serious and there must be some necessity for the alleged contributors to take action." Defendants' interpretation ignores that the term "may" exists before the standard of liability. In fact, when citing the statute, Defendants completely omit this term. However, courts find the term "may" significant in their analysis. As discussed in the foregoing, the statute includes "expansive language, which is intended to confer upon the courts the authority to grant affirmative equitable relief to the extent necessary to eliminate *any risk* posed by toxic wastes." Lincoln, 1993 WL 217429 * 13. As such, a plaintiff "need only demonstrate a measurable [but substantial] potential risk of harm." Fairway Shoppes, 1996 WL 924705 *7. By eliminating the term "may," Defendants have enunciated the wrong standard.[3]

Under an expansive reading of that statutory language, the Court finds that the contamination poses, or "may" pose, an imminent and substantial endangerment to health.

Based on a review of the evidence provided and case law on these issues, the Court grants Plaintiffs' motion for summary judgment. Plaintiffs are entitled to injunctive relief under RCRA.

## CONCLUSION

For the foregoing reasons, it is ORDERED that Plaintiffs' Motion for Summary Judgment (#164) is GRANTED. Further hearing will be conducted on the precise terms of injunctive relief to be ordered.

DATED: This 22nd day of July, 2010.

_____
United States District Judge

---

[3] In addition, it is persuasive that Defendants now claim that the PCE plume is not a concern because in 2002 they filed suit against the dry cleaning facility alleging that the PCE contamination beneath the site has impacted the soil and groundwater beneath the Shopping Center, and such contamination constituted "an imminent and substantial endangerment within the meaning of Section 6972(a)(1)(B) of RCRA." See First Amended Complaint in Case No. 2:02-cv-1218-LDG-RJJ.