1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

PETER J. VOGGENTHALER, et al.,      )
                                    )
            Plaintiffs,             )
                                    )
      v.                            )        2:08-cv-1618-RCJ-GWF
                                    )
MARYLAND SQUARE, LLC, et al.,       )        **ORDER**
                                    )
            Defendants.             )
                                    )
_____)

Currently before the Court are NDEP's Motion for Summary Judgment (#833); Maryland Square LLC's Cross Motion for Summary Judgment (#863); Motion to Strike the Declarations of Mary Siders, Greg Lovato and Jasmine Mehta (#874); and Motion for Reconsideration of Minute Order Granting Shapiro Defendants' Motion for Leave to File Surreply (#923). The Court heard oral argument on April 19, 2012.

**BACKGROUND**

**I.      Complaint**

On May 4, 2009, the Nevada Division of Environmental Protection ("NDEP") filed a complaint against Maryland Square Shopping Center, LLC; Irwin Kishner, Jerry Engel and Bank of America N.A., as co-trustees of the Herman Kishner Trust; Maryland Square LLC; Melvin Shapiro and Philip Shapiro, individually and doing business individually and/or as a general partner of "Al Phillips the Cleaner" or "Al Phillips the Cleaner, Inc."; estate of Philip Shapiro; Shapiro Bros. Investment Corporation; Al Phillips the Cleaners, Inc., dissolved corporation no. 745-1965; and Al Phillips the Cleaners, Inc., dissolved corporation no. 11-71

(collectively "Defendants").  (Compl. (NDEP #1) at 1).[1]  NDEP filed the complaint for cost recovery and injunctive relief as a result of perchloroethylene ("PCE") to soil and groundwater from the former site of an Al Phillips the Cleaner dry cleaning business located at 3661 South Maryland Parkway, Las Vegas, Nevada.  (*Id.* at 2).  As of January 2009, NDEP had incurred costs of $265,623.50 in responding to the potential human exposure to PCE resulting from the former Al Phillips' property.  (*Id.* at 7).

NDEP alleged four causes of action.  (*Id.* at 7-10).  In the first cause of action, NDEP sought cost recovery under the Comprehensive Environmental Response Compensation and Liability Act ("CERCLA"), 42 U.S.C. § 9607(a)(4), for the response costs associated with the releases and threatened release of PCE into the environment by the former Al Phillips' property.  (*Id.* at 7-8).  In the second cause of action, NDEP sought declaratory relief that Defendants were jointly and severally liable for any further costs of response incurred in response to the release or threatened releases of PCE and other hazardous substances at the Al Phillips' site, pursuant to CERCLA, 42 U.S.C. § 9613(g)(2).  (*Id.* at 8).  In the third cause of action, NDEP sought cost recovery under NRS § 459.537.  (*Id.* at 8-9).  In the fourth cause of action, NDEP sought injunctive relief requiring Defendants to complete an assessment of the extent and magnitude of the contamination resulting from releases from the former dry cleaner property that would be approved by NDEP, monitor groundwater, submit timely reports, submit a corrective action plan for soil and groundwater, and implement the corrective action plan approved by NDEP or as approved by NDEP with modification, pursuant to NRS § 445A.695.  (*Id.* at 9-10).

On July 22, 2010, this Court granted a motion to consolidate this case with *Voggenthaler v. Maryland Square, LLC et al.*, case no. 2:08-cv-1618-RCJ-GWF.  (Order (NDEP #76) at 15).

---

[1]  This case was originally filed under docket number 3:09-cv-231-RCJ-GWF.  All docket entry citations in this case will use "NDEP #___."

## II.    Undisputed Facts[2]

The Maryland Square Shopping Center ("the Shopping Center") has been owned by various defendants since 1968.  (NDEP Undisputed Facts (#847) at 2).  In 1968, Herman Kishner, doing business as Maryland Square Shopping Center, owned the Shopping Center.  (*Id.*).   In 1969, Herman Kishner created the Herman Kishner Trust, which became the successor-in-interest to the Shopping Center.  (*Id.*).  After the Herman Kishner Trust, Maryland Square Shopping Center LLC became the successor-in-interest to the Shopping Center.  (*Id.*).  In 2002, the Clark County School District purchased the Shopping Center from Maryland Square Shopping Center LLC.  (*Id.*).  In 2005, Defendant Maryland Square, LLC purchased the shopping center from the school district.  (*Id.*).  Defendant Maryland Square, LLC is the current owner of the shopping center.  (*Id.*).

From 1968 through August 31, 1984, Shapiro Bros. Investment Co. ("SBIC"), a now dissolved Nevada corporation, operated a dry cleaning facility at the Shopping Center ("the Site").  (*Id.*; Resp. to Undisputed Facts (#873) at 3).  SBIC had leased the Site from the landlord/owner of the Shopping Center.  (NDEP Undisputed Facts (#847) at 3).  SBIC had used PCE in its dry cleaning operations and had released PCE onto a concrete floor at the Site.[3]  (*Id.*).

In 1984, Johnson Group Inc., the predecessor of DCI USA, Inc. (collectively "DCI") purchased the Al Phillips the Cleaner, Inc. business from SBIC.  (*Id.*).  DCI leased the Site until 2003.  (*Id.*).  DCI operated the dry cleaning facility at the Site until approximately 2000.  (*Id.*).

---

[2]  NDEP filed a statement of undisputed facts in support of its motion for summary judgment.  (NDEP Undisputed Facts (#847)).  Maryland Square LLC does not dispute any of NDEP's facts.  (Maryland Square LLC Undisputed Facts (#862-1) at 2-5).  The Kishner Defendants dispute one of NDEP's facts, which is noted in this section.  (*See* Kishner Defendants' Undisputed Facts (#870-1) at 2-5).  The Shapiro Defendants clarify some of the undisputed facts.  (*See* Resp. to Undisputed Facts (#873) at 3, 5).  Those clarifications are noted in this section.

[3]  The Kishner Defendants and the Shapiro Defendants state that SBIC's written discovery admits certain spills of PCE onto the concrete floor at the Site, but not releases into the ground at the Site.  (*See* Kishner Defendants' Undisputed Facts (#870-1) at 3; Resp. to Undisputed Facts (#873) at 3).

The PCE discharge at the Site was first reported on November 29, 2000, during an environmental inspection done as part of a property transaction. (*Id.*). NDEP received an initial report on July 21, 2001. (*Id.*). PCE is a solvent that is commonly used in dry cleaning operations and is a hazardous substance as defined by CERCLA and the NAC § 445A.3454. (*Id.* at 4). Through oversight of NDEP, the Maryland Square Defendants[4] have conducted an investigation of the Site. (*Id.*). The investigation has revealed the presence of PCE in the soil and groundwater in and around the Site. (*Id.*). The investigation has also revealed a plume of groundwater containing PCE emanating from the Site ("the Plume"). The Plume has extended eastward into a residential neighborhood ("the Neighborhood"). The Plume has volatized into soil gas beneath the Neighborhood and presents a threat to the indoor air of the residents of the Neighborhood. (*Id.*).

An April 2007 soil gas report and computer simulation indicated a potential for vapor intrusion into the homes of the area. (*Id.*). Based on the soil gas data, NDEP determined that a potential existed for PCE vapor intrusion from shallow groundwater into the neighborhood residences to be present at rates sufficient to raise PCE concentrations in indoor air. (*Id.*). NDEP determined that indoor air PCE concentrations caused by the vapor intrusion had the potential to exceed indoor air concentrations estimated by the EPA to increase the probability of exposed individuals to contracting a case of cancer to higher than 1 in 10,000. (*Id.* at 5). NDEP offered the installation of subslab depressurization systems in certain homes to address the vapor intrusion issue. (*Id.*). In August 2007 through early 2008, NDEP notified residents, property owners, and local government officials of the PCE contamination in groundwater under the Neighborhood and possible long-term health effects. (*Id.*).

In 2008, NDEP notified the Maryland Square Defendants that it had expended approximately $160,000 to determine whether the PCE posed "a potential human exposure" in the Neighborhood and that it intended to expend additional state funds to address human

---

[4] The Maryland Square Defendants include Maryland Square LLC; Maryland Square Shopping Center LLC; Herman Kishner, dba as Maryland Square Shopping Center; and Irwin Kishner, Jerry Engel, and Bank of America as trustees for the Herman Kishner Trust. (Mot. for Summ. J. (#833) at 3).

4

1    exposures to PCE and that it would seek recovery of its expenses from the responsible

2    parties.  (*Id.*).  In May 2009, NDEP commenced the present lawsuit.  (*Id.*).

3                                    **LEGAL STANDARD**

4         In reviewing a motion for summary judgment, the court construes the evidence in the

5    light most favorable to the nonmoving party.  *Bagdadi v. Nazar*, 84 F.3d 1194, 1197 (9th Cir.

6    1996).  Pursuant to Fed.R.Civ.P. 56, a court will grant summary judgment "if the movant shows

7    that there is no genuine dispute as to any material fact and the movant is entitled to judgment

8    as a matter of law."  Fed.R.Civ.P. 56(a).  Material facts are "facts that might affect the outcome

9    of the suit under the governing law."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106

10   S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986).  A material fact is "genuine" if the evidence is such

11   that a reasonable jury could return a verdict for the nonmoving party.  *Id.*

12        The moving party bears the initial burden of identifying the portions of the pleadings and

13   evidence that the party believes to demonstrate the absence of any genuine issue of material

14   fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265

15   (1986).  A party asserting that a fact cannot be or is genuinely disputed must support the

16   assertion by "citing to particular parts of materials in the record, including depositions,

17   documents, electronically stored information, affidavits or declarations, stipulations (including

18   those made for purposes of the motion only), admissions, interrogatory answers, or other

19   materials" or "showing that the materials cited do not establish the absence or presence of a

20   genuine dispute, or that an adverse party cannot produce admissible evidence to support the

21   fact."  Fed. R. Civ. P. 56(c)(1)(A)-(B).  Once the moving party has properly supported the

22   motion, the burden shifts to the nonmoving party to come forward with specific facts showing

23   that a genuine issue for trial exists.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475

24   U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986).  "The mere existence of a

25   scintilla of evidence in support of the plaintiff's position will be insufficient; there must be

26   evidence on which the jury could reasonably find for the plaintiff."  *Anderson*, 477 U.S. at 252,

27   106 S.Ct. at 2512.  The nonmoving party cannot defeat a motion for summary judgment "by

28   relying solely on conclusory allegations unsupported by factual data."  *Taylor v. List*, 880 F.2d

1040, 1045 (9th Cir. 1989). "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." *Matsushita*, 475 U.S. at 587, 106 S.Ct. at 1356.

## DISCUSSION

In its motion for summary judgment, NDEP argues that this Court has jurisdiction to rule on its motion despite the pending appeals in this case because NDEP's motion for summary judgment is on the CERCLA claims and the pending appeals reference the RCRA claims. (Mot. for Summ. J. (#833) at 7-9). NDEP asserts that it is entitled to summary judgment on its CERCLA claim because: (1) the Shopping Center was a facility at the time of the release of PCE; (2) PCE is a hazardous substance under CERCLA; (3) a release of a hazardous substance occurred at the Shopping Center; and (4) Defendants were owners or operators of the facility at the time of the disposal. (*Id.* at 11-12). NDEP asserts that it has incurred costs–including past response costs and attorney fees–for remedial action that are consistent with the National Contingency Plan and are therefore recoverable. (*Id.* at 14-15, 19). NDEP also argues that it is entitled to summary judgment on its claims for declaratory relief, cost recovery pursuant to NRS § 459.537, and injunctive relief under NRS § 445A.695. (*Id.* at 20-21, 24).

In response, the various defendants argue that: (1) this Court lacks jurisdiction to adjudicate NDEP's motion because of the pending appeals; (2) CERCLA is unconstitutional because it exceeds Congress's Commerce Clause authority; and (3) they are not liable under CERCLA. Each of these arguments will be addressed in turn.

## I. Jurisdiction

Defendants Melvin Shapiro, Shapiro Brothers Investment Co., and the Estate of Philip Shapiro (collectively "the Shapiro Defendants") argue that this Court lacks jurisdiction to adjudicate NDEP's motion because this Court entered the permanent injunction based, in part, on CERCLA, and asserts that the permanent injunction is on appeal. (Opp'n to Mot. for Summ. J. (#871) at 3, 6).

Generally, "the filing of a notice of appeal . . . divests the trial court of jurisdiction." *In*

1  *re Silberkraus*, 336 F.3d 864, 869 (9th Cir. 2003).  "The purpose of this judicially-created
2  doctrine is to avoid the potential confusion and waste of resources from having the same issue
3  before two separate courts at the same time."  *Id.*

4      In this case, the same two issues are not before two separate courts.  This Court's
5  previous order, now on appeal, makes clear that this Court had granted summary judgment
6  on the Voggenthaler Plaintiffs' Resource Conservation and Recovery Act ("RCRA") claims.
7  (*See* Order (#390)).  Because NDEP seeks summary judgment on its CERCLA claims, the
8  same two issues are not before two separate courts and the Court will proceed to merits of the
9  motion for summary judgment.

10  **II.      CERCLA's Constitutionality**

11      The Shapiro Defendants and Maryland Square LLC argue that CERCLA as applied to
12  these facts exceeds Congress's Commerce Clause authority.  (Opp'n to Mot. for Summ. J.
13  (#862) at 5; Opp'n to Mot. for Summ. J. (#871) at 29).  They argue that the PCE contamination
14  only affected residences within Nevada.  (Opp'n to Mot. for Summ. J. (#862) at 5; Opp'n to
15  Mot. for Summ. J. (#871) at 30).

16      Although the Court believes that this lawsuit exceeds the authority granted by the
17  Commerce Clause to regulate a local contamination plume, this Court recognizes that, based
18  on existing case law, the Ninth Circuit will find that the Constitution permits enforcement of
19  CERCLA in this case.  *See United States v. Olin*, 107 F.3d 1506, 1510-11 (11th Cir. 1997)
20  (holding that CERCLA constitutes a permissible exercise of Congress's authority under the
21  Commerce Clause when it regulates intrastate, on-site waste disposal).  As such, the Court
22  will proceed to the merits of the motion.

23  **III.     First Claim: Cost Recovery under Section 107 of CERCLA**

24      Congress enacted CERCLA in response to the serious environmental and health risks
25  posed by industrial pollution.  *Burlington N. & Santa Fe R.R. Co. v. United States*, 556 U.S.
26  599, 129 S.Ct. 1870, 1874, 173 L.Ed.2d 812 (2009).  CERCLA was designed to promote the
27  timely clean up of hazardous waste sites and to ensure that the costs of such clean up efforts
28  were borne by those responsible for the contamination.  *Id.*

To recover costs under CERCLA § 107, NDEP must establish four elements: (a) the site on which the hazardous substances are contained is a "facility" under CERCLA's definition of that term, 42 U.S.C. § 9601(9); (b) "release" or "threatened release" of any "hazardous substance" from the facility has occurred, 42 U.S.C. § 9607(a)(4); (c) such "release" or "threatened release" has caused the plaintiff to incur response costs, 42 U.S.C. §§ 9607(a)(4), (a)(4)(B); and (d) the defendant is within one of four classes of persons subject to the liability provisions of Section 107(a). *3550 Stevens Creek Assoc. v. Barclays Bank of Cal.*, 915 F.2d 1355, 1358 (9th Cir. 1990).

Under the fourth element, CERCLA imposes strict liability for environmental contamination upon four broad classes of potentially responsible parties ("PRPs"):

(1) the owner and operator of a vessel or a facility,

(2) any person who at the time of disposal of any hazardous substance owned or operated any facility at which such hazardous substances were disposed of,

(3) any person who by contract, agreement, or otherwise arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment, of hazardous substances owned or possessed by such person, by any other party or entity, at any facility or incineration vessel owned or operated by another party or entity and containing such hazardous substances, and

(4) any person who accepts or accepted any hazardous substances for transport to disposal or treatment facilities, incineration vessels or sites selected by such person, from which there is a release, or a threatened release which causes the incurrence of response costs, of a hazardous substance . . .

42 U.S.C. § 9607(a)(1)-(4).  An entity identified as a PRP is liable for:

(A) all costs of removal or remedial action incurred by . . . a State . . . not inconsistent with the national contingency plan;

(B) any other necessary costs of response incurred by any other person consistent with the national contingency plan;

(C) damages for injury to, destruction of, or loss of natural resources, including the reasonable costs of assessing such injury, destruction, or loss resulting from such a release; and

(D) the costs of any health assessment or health effects study carried out under [42 U.S.C. § 9604(i)].

42 U.S.C. § 9607(a)(4)(A)-(D).

Once the government presents a *prima facie* case for response costs, the burden shifts

to the defendant to prove the government's response action was inconsistent with the National

Contingency Plan ("NCP").  *United States v. Chapman*, 146 F.3d 1166, 1169 (9th Cir. 1998).

The NCP is "designed to make the party seeking response costs choose a cost-effective

course of action to protect the public health and the environment."  *Id.* at 1170.  In order to

show that NDEP's actions were inconsistent with the NCP, the burden is on the defendant to

show that NDEP acted in an "arbitrary and capricious manner in choosing a particular

response action."  *Cal. Dep't of Toxic Substances Control v. Neville Chemical Co.*, 358 F.3d

661, 673 (9th Cir. 2004); 42 U.S.C. § 9613(j)(2).  "When a state is seeking recovery of

response costs, consistency with the national contingency plan is presumed."  *Cal. Dep't of

Toxic Substances Control*, 358 F.3d at 673.

In this case, none of the defendants challenge the first three elements of the *prima facie*

case to establish a CERCLA claim.   The defendants make various challenges to the

designation of a PRP and some defendants contest whether NDEP's response action was

consistent with the NCP.  Each of the defendants arguments will be addressed in turn.

### A.      Maryland Square LLC

Maryland Square LLC does not dispute that it is the current owner or operator of a

facility.  *See* 42 U.S.C. § 9607(a)(1); (*see* Opp'n to Mot. for Summ. J. (#862) at 9).  However,

it asserts that, even if it is the current owner or operator, it is not liable under CERCLA

because of the bona fide prospective purchaser exception.  (*Id.*).

Pursuant to 42 U.S.C. § 9607(r), "a bona fide prospective purchaser whose potential

liability for a release or threatened release is based solely on the purchaser's being considered

to be an owner or operator of a facility shall not be liable as long as the bona fide prospective

purchaser does not impede the performance of a response action or natural resource

restoration."  42 U.S.C. § 9607(r)(1).  A "bona fide prospective purchaser" is a person that

acquires ownership of a facility and establishes eight criteria[5] by a preponderance of the

---

[5] The bona fide prospective purchaser must establish that: (1) all disposal of hazardous
substances at the facility occurred before the person acquired the facility; (2) the person made
all the appropriate inquires into the previous ownership and uses of the facility in accordance
with standards and practices; (3) the person provided all legally required notices with respect

9

1    evidence.  42 U.S.C. § 9601(40)(A)-(H).

2          In this case, Maryland Square LLC only provides argument that they satisfied the eight

3    criteria to become a bona fide prospective purchaser.  However, Maryland Square LLC

4    provides no evidence of any kind supporting its argument that it is a bona fide prospective

5    purchaser.  As such, Maryland Square LLC fails to establish a genuine issue of material fact

6    as to its liability under CERCLA § 107(a).  Moreover, Maryland Square LLC does not assert

7    that the recovery costs are inconsistent with the National Contingency Plan.  Accordingly, the

8    Court grants summary judgment (#833) to NDEP against Maryland Square LLC on claim one.[6]

9          **B.    Kishner Defendants**

10         The Kishner Defendants[7] argue that they are not a "person who at the time of disposal

11   of any hazardous substance owned or operated any facility at which such hazardous

12   substances were disposed of" pursuant to Supreme Court law.  (Opp'n to Mot. to Summ. J.

13   (#870) at 3).

14         CERCLA defines "owner or operator" as "any person owning or operating such facility."

15   42 U.S.C. § 9601(20)(A)(ii).  A "facility" is "any building, structure . . ." or "any site or area

16   where a hazardous substance has been deposited, stored, disposed of, or placed, or

17   otherwise come to be located."  42 U.S.C. § 9601(9)(A)-(B).  In *United States v. Bestfoods*,

18

19   _____

20   to the discovery or release of any hazardous substances at the facility; (4) the person
     exercised appropriate care with respect to the hazardous substances by taking reasonable
21   steps to stop any continuing release, prevent future release, and prevent or limit exposure to
     the previous release; (5) the person provided full cooperation to persons authorized to conduct
     response actions; (6) the person is in compliance with any land use restrictions established;
22   (7) the person complies with information requests and subpoenas; and (8) the person is not
     affiliated with any person that is potentially liable for response costs. 42 U.S.C. § 9601(40)(A)-
23   (H).

24   [6] Maryland Square LLC also filed a cross-motion for summary judgment (#863) which
     is the exact same document as its opposition to NDEP's motion for summary judgment.  The
25   Court denies the cross-motion for summary judgment (#863) on claim one because Maryland
     Square LLC fails to provide any evidence demonstrating that it is a bona fide prospective
26   purchaser as a matter of law.

27   [7] The Kishner Defendants are Maryland Square Shopping Center LLC, the Herman
     Kishner Trust d/b/a Maryland Square Shopping Center, Irwin Kishner, Jerry Engel, and Bank
28   of America, as Trustees for The Herman Kishner Trust.  (Opp'n to Mot. for Summ. J. (#870)
     at 1).

524 U.S. 51, 66, 118 S.Ct. 1876, 1887, 141 L.Ed.2d 43 (1998), the Supreme Court held that, under CERCLA, an "operator" is someone who "must manage, direct, or conduct operations specifically related to pollution."

In this case, the Kishner Defendants were not "operators."  However, they were owners of the site of the dry cleaners from 1968 through 2002.  PCE was first reported on the site on November 2000.  As such, the Kishner Defendants were owners under the meaning of the statute and NDEP has established a *prima facie* case against the Kishner Defendants for CERCLA liability.

The Kishner Defendants argue that they are not jointly and severally liable under CERCLA because the Shapiro Defendants were the operators of the dry cleaners when the releases occurred.  (Opp'n to Mot. for Summ. J. (#870) at 4).  The Kishner Defendants also argue that they need to conduct more discovery to determine whether the response costs were consistent with the National Contingency Plan.  (*Id.* at 5).  Specifically, the Kishner Defendants assert that they will need to serve requests for production of documents to NDEP, subpoenas for business records to Broadbent & Associates and Brown & Caldwell, and conduct depositions of the NDEP staff and the persons most knowledgeable of Broadbent & Associates and Brown & Caldwell because NDEP alleges costs in the amount of $321,238.15 to Broadbent & Associates and $26,286.60 to Brown & Caldwell.  (*Id.*).

In reply, NDEP argues that the Kishner Defendants do not need further discovery and are attempting to prevent the Court from granting summary judgment at this time.  (Reply to Mot. for Summ. J. (#898) at 8).  NDEP argues that the Kishner Defendants have been deeply involved with NDEP throughout the entire remediation process over the last several years and that they cannot point to a single instance where NDEP's actions were inconsistent with the NCP.  (*Id.* at 6).

As noted above, in order to show that NDEP's actions were inconsistent with the NCP, the burden is on the defendant to show that NDEP acted in an "arbitrary and capricious manner in choosing a particular response action."  *Cal. Dep't of Toxic Substances Control*, 358 F.3d at 673; 42 U.S.C. § 9613(j)(2).  Title 40 C.F.R. § 300.415 sets forth the mandatory factors

1    that a lead agency must consider in determining the appropriateness of a removal action.[8]

2    *See* 40 C.F.R. § 300.415(b)(2)(i)-(viii).

3    　　In this case, the Kishner Defendants do not argue that they are going to be seeking

4    discovery on anything that demonstrates that NDEP failed to consider the mandatory factors

5    of NRS § 300.415.  Instead, it appears that the Kishner Defendants are going to try to contest

6    the costs of specific response actions taken by NDEP.  However, attacking the specific costs

7    of the actions taken by NDEP will not demonstrate that NDEP's actions were arbitrary and

8    capricious because NDEP's actions would be arbitrary and capricious if they failed to comply

9    with the mandatory factors.   Because the Kishner Defendants do not seek discovery

10   demonstrating that NDEP failed to comply with the mandatory factors, the Court denies the

11   request for further discovery and grants the motion for summary judgment (#833) on the first

12   cause of action against the Kishner Defendants.

13   　　**C.    Shapiro Defendants[9]**

14

15   　　[8]  Pursuant to 40 C.F.R. § 300.415(b)(2), NDEP must consider the following:
     (i) Actual or potential exposure to nearby human populations, animals, or the

16   food chain from hazardous substances or pollutants or contaminants;
     (ii) Actual or potential contamination of drinking water supplies or sensitive

17   ecosystems;
     (iii) Hazardous substances or pollutants or contaminants in drums, barrels,

18   tanks, or other bulk storage containers, that may pose a threat of release;
     (iv) High levels of hazardous substances or pollutants or contaminants in soils

19   largely at or near the surface, that may migrate;
     (v) Weather conditions that may cause hazardous substances or pollutants or

20   contaminants to migrate or be released;
     (vi) Threat of fire or explosion;

21   (vii) The availability of other appropriate federal or state response mechanisms
     to respond to the release; and

22   (viii) Other situations or factors that may pose threats to public health or welfare
     of the United States or the environment.

23
     　　[9]  The Shapiro Defendants argue that NDEP has not provided any evidence supporting

24   any of its claims against Melvin Shapiro or the Estate of Philip Shapiro.  (Opp'n to Mot. for
     Summ. J. (#871) at 24).  In response, NDEP argues that Melvin and Philip Shapiro directly

25   managed and oversaw their closely held family dry cleaning business.  (Reply to Mot. for
     Summ. J. (#902) at 17).

26   　　The evidence that NDEP cites to support their argument that Melvin and Philip Shapiro
     directly managed and oversaw the dry cleaning does not actually state that either of the

27   brothers did such a thing.  (*See id.*).  Although it is true that the brothers each owned 50% of
     the stock and were corporate officers, there is no evidence that they managed, directed, or

28   conducted operations specifically related to pollution.  *See Best Foods*, 524 U.S. at 66, 118
     S.Ct. at 1887.  As such, all references to liability of the Shapiro Defendants refer only to SBIC

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18

        The Shapiro Defendants argue that NDEP failed to present undisputed evidence that hazardous substances were released into the environment when SBIC operated the dry cleaning facility. (Opp'n to Mot. to Summ. J. (#871) at 12).  SBIC states that its interrogatories stated that "occasionally a button trap would clog and amounts of PCE would spill onto the concrete floor" and that, in 1982, "a filter change resulted in a spill of PCE onto the concrete floor." (Id.).  The Shapiro Defendants assert that a former employee estimated that 100 gallons of PCE had spilled during the course of the filter change in 1982 but notes that there was no measurement of the quantity of the spill at that time. (Id. at 12 n.3).  The Shapiro Defendants dispute the declaration of Dr. Mary A. Siders, who offers an opinion on the timing of the PCE release from the dry cleaning facility.[10] (Id. at 13).  The Shapiro Defendants argue that Dr. Siders' declaration is deficient because she has not identified which portions of her declaration are based on personal knowledge and on information and belief, and that the declaration is "suffused with inadmissible evidence."[11] (Id. at 13-14).  The Shapiro Defendants also assert that the declaration of their expert, Stephen Henshaw, demonstrates that Dr. Siders' declaration is flawed, unreliable, and materially disputed. (Id. at 18).  The Shapiro Defendants also argue that NDEP's response action was inconsistent with the National Contingency Plan. (Id. at 22).  The Shapiro Defendants assert that NDEP failed to present evidence that it complied with 40 C.F.R. § 300.415(n)(2)(i)-(iii). (Id. at 22-23).

19
20
21
22

        In reply, NDEP asserts that it only needs to demonstrate that it incurred costs for removal or remediation that were not inconsistent with the National Contingency Plan. (Reply to Mot. for Summ. J. (#902) at 12).  NDEP concedes that it did not make its removal decision available for public notice and comment but argues that it does not mean that its actions were

23
24
25
26
27
28

and not individually to Melvin or Philip Shapiro.

        [10] Dr. Siders opines that the release date of the PCE from the former dry cleaner in the former Maryland Square Shopping Center was 1971. (Siders' Decl. (#833-2) at 4).

        [11] The Shapiro Defendants also argued that NDEP had failed to previously disclose Dr. Siders as an expert. (Opp'n to Mot. for Summ. J. (#871) at 17-18).  However, pursuant to a stipulation, Shapiro Defendants agreed to withdraw this argument in exchange that NDEP would not raise the same challenge to the Shapiro Defendants' expert, Stephen Henshaw. (Amended Stip. Order (#907) at 3-4).

1    inconsistent with the National Contingency Plan.  (*Id.* at 13).

2        In a previous order, this Court found that there was sufficient evidence in a prior motion

3    for summary judgment "to conclude that the PCE plume at issue in this case stemmed from

4    the operation of the dry cleaning facility at the Shopping Center" and that "SBIC was the owner

5    and operator of that dry cleaning facility until 1984."  (Order (#487) at 9).  Therefore, the

6    Shapiro Defendants were persons who, at the time of disposal of any hazardous substances,

7    owned and operated the facility at which such hazardous substances were disposed of.  As

8    such, NDEP has established a *prima facie* case for liability.[12]

9        With respect to the National Contingency Plan ("NCP"), 40 C.F.R. § 300.415(n)

10   provides that, in cases where the lead agency determines that a removal action is appropriate

11   and less than six months exists before on-site removal activity must begin, the lead agency

12   shall: (1) publish a notice of availability of the administrative record file in a major local

13   newspaper of general circulation; (2) provide a public comment period; and (3) prepare a

14   written response to significant comments.  40 C.F.R. § 300.415(n)(2)(i)-(iii).

15       In *Washington State Dep't of Transp. v. Washington Natural Gas Co., Pacificorp*, 59

16   F.3d 793 (9th Cir. 1995), the Ninth Circuit held that the state's actions were inconsistent with

17   the NCP after "[l]ooking at the situation as a whole."  *Id.* at 805.  There, the Ninth Circuit found

18   that the state "failed to assess accurately both the nature and the extent of the threat posed

19   by the presence of PAHs in the soil, failed to evaluate alternatives in the matter prescribed in

20   the NCP, and failed to provide opportunity for public comment."  *Id.*  The Ninth Circuit held that

21   _____

22   [12] The Shapiro Defendants file a Motion to Strike the Declarations of Mary Siders, Greg
     Lovato, and Jasmine Mehta based on alleged deficiencies in their declarations. (Mot. to Strike
23   (#874) at 1-2).  After the Shapiro Defendants had filed their opposition to the motion for
     summary judgment, NDEP filed subsequent declarations to address these alleged
24   deficiencies. (*See* Siders Supp. Decls. (#894-1, 902-1); Lovato Supp. Decls. (#894-7, 903-1)).
     In response to the subsequently filed declarations, the Shapiro Defendants filed a Motion for
25   Leave to File a Surreply to NDEP's Reply in Support of its Motion for Summary Judgment
     (#918), which this Court granted.  (Minute Order (#920)).  The surreply responds to the
26   subsequently filed declarations. (*See generally* Surreply (#918-1)).  As such, the Court denies
     as moot the Motion to Strike (#874) because the subsequent declarations address the Shapiro
27   Defendants concerns.  Additionally, the surreply gives the Shapiro Defendants an opportunity
     to respond to the subsequently filed declarations.  The Court also denies NDEP's Motion for
28   Reconsideration of this Court's Minute Order Granting Shapiro Defendants' Motion for Leave
     to File Surreply (#923).

"[g]iven the high degree of inconsistency with the requirements set forth in the NCP, [the state's] action [was] arbitrary and capricious" and that the state was not entitled to recover its response costs. *Id.*

In this case, the Shapiro Defendants fail to demonstrate that NDEP acted in an arbitrary and capricious manner in choosing to conduct the indoor air removal action. The Shapiro Defendants do not allege or provide any evidence that NDEP failed to access the appropriateness of the removal action pursuant to the mandatory factors outlined in 40 C.F.R. § 300.415(b)(2)(i)-(viii). The Shapiro Defendants do not allege or provide any evidence that the removal action was unnecessary to mitigate the potential human exposure to PCE vapor by the indoor air exposure pathway or that NDEP's chosen action was not rationally based upon groundwater data, soil gas sampling data, modeling of soil gas and groundwater data for homes likely to be impacted by PCE-contaminated soil gas, and actual indoor air sampling. The Shapiro Defendants do not allege or provide any evidence that NDEP failed to evaluate alternatives in the manner prescribed in the NCP. Looking at the situation as a whole, NDEP only failed to provide an opportunity for public comment. Because the Shapiro Defendants have not demonstrated that NDEP failed to comply with any other requirements in the NCP, the Court finds that NDEP's action was not arbitrary and capricious because there was a high degree of consistency with the NCP's requirements. As such, the Court grants summary judgment (#833) to NDEP on the first claim against the Shapiro Defendants.

**D.   NDEP's Request for Attorneys' Fees**

NDEP also moves for reasonable attorneys' fees attributable to the litigation as response costs under CERCLA. (Mot. for Summ. J. (#833) at 19). NDEP asserts that it has incurred 866.8 hours of attorney time from August 15, 2007 to October 2011. (*Id.*). NDEP asserts that its attorneys' fees should be reimbursed at a reasonable hourly rate of $390 per hour, which it alleges is the prevailing rate in the Northern Nevada community. (*Id.*). NDEP seeks attorneys' fees totaling in the amount of $338,052. (*Id.*).

In response, Maryland Square LLC does not address NDEP's request for attorneys' fees in its opposition. (*See generally* Opp'n to Mot. for Summ. J. (#862)). The Shapiro

Defendants do not address NDEP's request for attorneys' fees in its opposition.  (*See generally* Opp'n to Mot. for Summ. J. (#871)).  The Kishner Defendants argue that summary judgment on this claim should be deferred until it has time to conduct discovery on this issue. (Opp'n to Mot. for Summ. J. (#870) at 7).  The Kishner Defendants assert that the Attorney General's invoices demonstrate that the Attorney General's office does not have the same institutional controls as in the private sector to ensure accurate billing because it bills in one-hour increments and uses general descriptions for billing activities.  (*Id.* at 6).  The Kishner Defendants also argue that the request for $390/hour is not adequately supported because it does not reflect the hourly rate of a public agency and is a higher rate than what this Court previously found reasonable for the Voggenthaler Plaintiffs' counsel.  (*Id.*).  The Kishner Defendants assert that the Voggenthaler Plaintiffs' counsel had hourly rates between $175 and $300/hour and that NDEP's rates should be $200/hour.  (*Id.* at 7).

In reply, NDEP states that it will ask for rates of $300/hour for Carolyn Tanner and William Frey and $250/hour for Jasmine Mehta based on this Court's previous reasonable rate structure of $300/hour for partners with 20 or more years of experience, $250/hour for an experienced associate, and $175 for new associates.  (Reply to Mot. for Summ. J. (#898) at 10).  Based on that rate structure, NDEP seeks attorneys' fees in the amount of $247,425. (*Id.*).  NDEP seeks recovery of attorneys' fees for work performed from August 2007 through the present.  (*Id.*).  Based on its original rate request, NDEP seeks attorneys' fees in the amount of $338,052 from August 2007 to October 20, 2011, and $120,744 from October 21, 2011 to February 19, 2012, for a total amount of $458,796.  (*Id.* at 11-12).  NDEP asserts that, if the Court finds that the lower rates are more reasonable, the total amount sought is $326,630.  (*Id.* at 12).

In *Chapman*, the Ninth Circuit held that, under CERCLA, statutory authority permits the government, as a prevailing party, to recover attorneys' fees attributable to the litigation as part of its response costs.   146 F.3d at 1175.   The government is only entitled to recover "reasonable" attorneys' fees.  *Id.* at 1176.

In this case, the Court grants in part and denies in part the motion for attorneys' fees.

Pursuant to *Chapman*, this Court finds that NDEP is entitled to an award of reasonable attorneys' fees.  Pursuant to the discussions at oral argument, the Court finds that the "lower" rates of $200/hour and $175/hour are reasonable for NDEP's attorneys.  However, the Court denies in part the motion for the amount sought until the Kishner Defendants have an opportunity to brief the reasonableness of the fees sought with respect to the hours billed.

Accordingly, the Court grants in part and denies in part NDEP's motion for summary judgment (#833) on its first cause of action.  The Court grants summary judgment on claim one as to all Defendants.  However, the Court denies NDEP's request for attorneys' fees in the amount of $326,630[13] until after the Kishner Defendants conduct further discovery and brief the issue of reasonableness on the billable hours sought.

## IV.    Second Claim: Declaratory Relief under CERCLA

NDEP asserts that it is entitled to declaratory relief under CERCLA because it has established that Defendants are liable under CERCLA's strict liability standards.  (Mot. for Summ. J. (#833) at 20).

In response, Maryland Square LLC asserts the same argument that it did for claim one.  (*See* Opp'n to Mot. for Summ. J. (#862) at 9-13).  The Kishner Defendants argue that granting summary judgment on this claim is premature because it still has to conduct further discovery on NDEP's actions under the NCP.  (Opp'n to Mot. for Summ. J. (#870) at 7).  The Shapiro Defendants argue that NDEP is not entitled to declaratory relief on future response costs because it did not establish that it was entitled to past response costs.  (Opp'n to Mot. for Summ. J. (#871) at 23).

In interpreting 42 U.S.C. § 9613(g)(2), the Ninth Circuit has held that "if a plaintiff successfully establishes liability for the response costs sought in the initial cost-recovery action, it is entitled to a declaratory judgment on present liability that will be binding on future cost-recovery actions."  *City of Colton v. Am. Promotional Events, Inc.-West*, 614 F.3d 998,

---

[13] The Court directs NDEP to file a motion for attorneys' fees under the rates specified within 20 days of this order.  The Kishner Defendants shall have the time set in the rules to file a response.

1  1007 (9th Cir. 2010). Section 9613(g)(2) provides that "the court shall enter a declaratory

2  judgment on liability for response costs or damages that will be binding on any subsequent

3  action or actions to recover further response costs or damages." 42 U.S.C. § 9613(g)(2).

4  As discussed above, NDEP has established liability for response costs in the initial cost-

5  recovery claim under 42 U.S.C. § 9607 for Maryland Square LLC, the Kishner Defendants, and

6  the Shapiro Defendants.  As such, the Court grants NDEP's motion for summary judgment

7  (#833) on claim two against Maryland Square LLC[14], the Kishner Defendants, and the Shapiro

8  Defendants.

9  **V.    Third Claim: Cost Recovery under Nevada Revised Statutes**

10  NDEP asserts that it is entitled to recover its expenditures from the Hazardous Waste

11  Fund that it used to address the indoor air exposure pathway and for its preliminary

12  groundwater clean-up evaluation pursuant to NRS § 459.537.  (Mot. for Summ. J. (#833) at

13  21).  NDEP asserts that it has expended $347,478.55 from the Hazardous Waste Fund for

14  installation and evaluation of the SSD systems to mitigate the indoor air exposure pathway and

15  for a preliminary groundwater clean up evaluation.  (*Id.* at 22).  NDEP also argues that it

16  expended $45,477.48 in indirect costs in mitigating the exposure pathway including staff time

17  and overhead and attorneys' fees[15] in the amount of $11,328.41.  (*Id.*).

18  In response, Maryland Square LLC argues that it is not liable under a plain reading of

19  NRS § 459.537 because it did not own the property at the time of disposal.  (Opp'n to Mot. for

20  Summ. J. (#862) at 13).  The Kishner Defendants respond that they do not fall within the class

21  of persons subject to liability under the statute and that the statute does not apply because

22  there was no documented spill.  (Opp'n to Mot. for Summ. J. (#870) at 8-11).  The Shapiro

23  Defendants argue that NDEP has not produced any evidence that it was responsible for any

24  leak or spill.  (Opp'n to Mot. for Summ. J. (#871) at 26).  The Shapiro Defendants also assert

25

26  [14]  The Court also denies Maryland Square LLC's cross-motion for summary judgment
(#863) on this claim.

27  [15]  NDEP asserts that if the Court awards attorneys' fees under CERCLA, then it will not
28  seek an additional $11,328.41 in attorneys' fees because that amount is subsumed within the
fees sought under CERCLA.  (Mot. for Summ. J. (#833) at 22 n.6).

1
2
3

that NDEP failed to send it a letter informing them that they were potentially responsible parties and that NDEP intended to use funds from the Hazardous Waste Fund to address the area affected by the spill.  (*Id.* at 27-28).

4

NDEP filed replies.  (Reply to Mot. for Summ. J. (#884, 898, 902)).

5
6
7
8
9
10
11
12
13
14
15
16
17

Nevada Revised Statute § 459.537 provides that money from the Account for the Management of Hazardous Waste may be expended to pay the costs of responding to the leak, spill, or accident, including coordinating efforts of various agencies, managing the cleaning and decontamination of the area, and removal of the hazardous material if the person responsible for the leak or spill "does not act promptly and appropriately to clean and decontaminate the affected area properly, and if his or her inaction presents an imminent and substantial hazard to human health, public safety or the environment."  Nev. Rev. Stat. § 459.537(1)(a)-(d).  The statute provides that the Director shall demand reimbursement of the Account for money from any person "who is responsible for the accident, leak or spill, or who owns or controls the hazardous waste, hazardous material or a regulated substance, or the area used for the disposal of the waste, material or substance."  Nev. Rev. Stat. § 459.537(2). The term "does not act promptly and appropriately" means that the person did not clean and decontaminate the affected area properly.[16]  Nev. Rev. Stat. § 459.537(4)(a)(4).

18
19
20
21
22
23
24
25

There are no cases that interpret NRS § 459.537.  As such, the Court looks to the plain meaning of the statute to determine liability.  *See Allstate Ins. Co. v. Fackett*, 206 P.3d 572, 576 (Nev. 2009) (holding that to determine legislative intent under the NRS the court first looks to the plain language of statute and only looks beyond the plain language if it is ambiguous or silent on the issue in question).  A plain reading of the statute demonstrates that the following people are responsible for reimbursing the hazardous waste account: (1) those who are responsible for the accident, leak, or spill; (2) those who own or control the hazardous waste, hazardous material, or regulated substance; or (3) those who own or control the area

26
27
28

---

[16]  The term "does not act promptly and appropriately" lists four other definitions but uses the word "or" to indicate that any of those definitions may stand alone.  *See* Nev. Rev. Stat. § 459.537(4)(a)(1), (2), (3), (5).

1  used for the disposal of the waste, material, or substance.  *See* Nev. Rev. Stat. § 459.537(2).

2  The statute does not provide any temporal limits on liability.

3      In this case, Maryland Square LLC is liable under the statute because it owns or

4  controls the area used for the disposal of the waste, material, or substance because it is the

5  current owner of the Shopping Center.  As such, the Court grants summary judgment (#833)

6  for NDEP on the third cause of action against Maryland Square LLC.[17]

7      With respect to the Kishner Defendants, they are also liable under the statute because

8  they owned or controlled the area used for the disposal of the waste when the dry cleaner

9  operated on property that they owned.  Moreover, the full definition of "does not act promptly

10  and appropriately" demonstrates that the statute applies not only when a person does not act

11  immediately, i.e. within 2 hours of notification of the incident, but also when a person "[d]oes

12  not clean and decontaminate the affected area properly" after notification, without respect to

13  time.  *See* Nev. Rev. Stat. § 459.537(4)(a)(1)-(2), (4).  As such, the Kishner Defendants are

14  liable under the statute because it failed to decontaminate the area after finding out about the

15  leak, spill, or accident, regardless of time.  Therefore, the Court grants summary judgment

16  (#833) to NDEP on the third cause of action against the Kishner Defendants.

17      The Shapiro Defendants are also liable under the statute because this Court has

18  already found that they were responsible for the accident, leak, or spill of hazardous materials.

19  Additionally, although NDEP did not send the Shapiro Defendants a letter, there is no

20  requirement under the statute that NDEP send them a letter.  Therefore, the Shapiro

21  Defendants are not shielded from liability based on the absence of an NDEP letter.  As such,

22  the Court grants summary judgment (#833) to NDEP on the third cause of action against the

23  Shapiro Defendants.   Accordingly, the Court grants summary judgment (#833) to NDEP on

24  the third cause of action.

25  **VI.    Fourth Claim: Injunctive Relief under NRS § 445A.695**

26      NDEP argues that it is entitled to injunctive relief pursuant to NRS § 445A.695 because

27

28      [17]   The Court denies Maryland Square LLC's cross-motion for summary judgment (#863) on this claim.

Defendants violated NRS § 445A.465.  (Mot. to Summ. J. (#833) at 24-25).  NDEP argues that Defendants violated NRS § 445A.465 by discharging any pollutant into any waters of the State from a point source or allowing a pollutant from a point source to remain in place where the pollutant or fluids could be carried into the waters of the State by any means.  (*Id.* at 25).  NDEP seeks a mandatory injunction against each Defendant to (1) complete an NDEP-approved assessment of the extent and magnitude of the contamination resulting from releases from the former Al Phillips the Cleaner property; (2) monitor groundwater; (3) submit timely reports; (4) submit a corrective action plan for soil and groundwater; and (5) implement the corrective action plan approved by NDEP or as approved by NDEP with modification.  (*Id.*).

In response, Maryland Square LLC argues that NDEP has not presented evidence that it violated NRS § 445A.465 because NDEP does not claim than any PCE currently remains on the soil of the property or that any additional PCE could travel to the plume or into Nevada's waterways.  (Opp'n to Mot. for Summ. J. (#862) at 14).  The Kishner Defendants argue that NDEP fails to identify a "point source" and only states that PCE was released into soil and groundwater at the site.  (Opp'n to Mot. for Summ. J. (#870) at 13).  The Kishner Defendants argue that there was no evidence that they were responsible for the spills or the release of the PCE by the operators of the dry cleaners and that they cannot be responsible for the discharge from any point source of the pollutant.  (*Id.* at 14).  The Shapiro Defendants argue that there is a dispute as to whether Melvin or Philip Shapiro ever owned or operated the dry cleaning facility and that there is a dispute as to whether SBIC operated the facility when PCE was released into the soil or groundwater.  (Opp'n to Mot. for Summ. J. (#871) at 28-29).

In reply, NDEP asserts that Maryland Square LLC does not dispute that, for six years of its ownership of the site, it allowed PCE in the contaminated soil to remain in place where it could be carried into the waters of the State.  (Reply to Mot. for Summ. J. (#884) at 16).  NDEP also asserts that Maryland Square LLC does not dispute that such contamination has made it into the waters of the State.  (*Id.*).  NDEP argues that the Kishner Defendants are liable because a plain reading of the statute does not require a person to actively discharge the PCE.  (Reply to Mot. for Summ. J. (#898) at 19).  NDEP argues that the Kishner

21

1
2
3
4
5

Defendants owned the drain pipes beneath the dry cleaning facility where the highest concentrations were found and, thus, PCE was discharged from a point source which the Kishner Defendants owned.  (*Id.*).  NDEP asserts that, with respect to the Shapiro Defendants, this Court has already found that SBIC was the operator of the site where PCE was released into the soil and groundwater.  (Reply to Mot. for Summ. J. (#902) at 20).

6
7
8
9
10
11
12
13
14
15
16
17

Pursuant to NRS § 445A.695, the Director of the State Department of Conservation and Natural Resources "may seek injunctive relief in the appropriate court to prevent the continuance or occurrence of any act or practice which violates any provision of NRS 445A.300 to 445A.730."  Nev. Rev. Stat. § 445A.695(1).  Pursuant to NRS § 445A.465, it is unlawful for any person to "(c) [d]ischarge from a point source a pollutant . . . that could be carried into the waters of the State by any means" or "(d) [a]llow a pollutant discharged from a point source . . . to remain in a place where the pollutant or fluids could be carried into the waters of the State by any means."  Nev. Rev. Stat. § 445A.465(1)(c)-(d).  A "point source" is "any discernible, confined and discrete conveyance, including but not limited to any pipe, ditch, channel, tunnel, conduit, . . . , from which pollutants are or may be discharged."  Nev. Rev. Stat. § 445A.395.  "Discharge" means "any addition of a pollutant or pollutants to water."  Nev. Rev. Stat. § 445A.345.

18
19
20
21
22
23
24
25
26

In this case, the facts demonstrate that an NDEP investigation revealed the presence of PCE in the soil and groundwater in and around the Site.  The investigation also revealed a plume of groundwater containing PCE emanating from the Site and that the PCE concentration in the plume beneath the neighborhood was above the maximum contaminant level, or federal drinking water standard, for PCE.  Additionally, in this Court's prior order, it found that the owners and prior owners of the Shopping Center had leased space to a dry cleaning facility that had used PCE and that, those defendants, had "owned the drain pipes beneath the dry cleaning facility where the highest concentrations of PCE were found." (*See* Order (#390) at 11-12).

27
28

Here, Maryland Square LLC is liable under NRS § 445A.465 because it allowed a pollutant discharged from a pipe to remain in place where the pollutant was carried into the

1    groundwater of the State.  Maryland Square LLC does not argue that, since its ownership in

2    2005, that it did anything to remove PCE from the site.  As such, Maryland Square is liable

3    under § 445A.465 and the Court grants the motion for summary judgment (#833) on claim four

4    for injunctive relief against Maryland Square LLC pursuant to § 445A.695.[18]

5         With respect to the Kishner Defendants, the undisputed facts demonstrate that PCE

6    discharge was first reported in November 2000 on the Site and that the Kishner Defendants

7    owned the Shopping Center until 2002.  The Kishner Defendants, as owners of the Shopping

8    Center, permitted the PCE to remain in place and to be carried into the groundwater of the

9    State.  As such, the Kishner Defendants are liable under § 445A.465 and the Court grants the

10   motion for summary judgment (#833) on claim four for injunctive relief against the Kishner

11   Defendants pursuant to § 445A.695.

12        With respect to the Shapiro Defendants, this Court previously found that SBIC had

13   released PCE into the ground at the dry cleaner site.  Thus, SBIC discharged from a point

14   source a pollutant that could, and did, carry into the groundwater of the State.  As such, the

15   Court grants the motion for summary judgment (#833) on claim four for injunctive relief against

16   the Shapiro Defendants pursuant to § 445A.695.

17        Accordingly, the Court grants the motion for summary judgment (#833) on claim four.

18                                    **CONCLUSION**

19        For the foregoing reasons, IT IS ORDERED that NDEP's Motion for Summary

20   Judgment (#833) is GRANTED in part and DENIED in part.  The Court GRANTS summary

21   judgment to NDEP on all substantive claims.  The Court also GRANTS NDEP reasonable

22   attorneys' fees, but DENIES the motion for a specific amount of fees at this time.  NDEP is

23   directed to file a motion for attorneys' fees based on the rates of $200/hour and $175/hour

24   within 20 days of this Order.  The Kishner Defendants shall respond to the motion within the

25   period specified by the rules.

26        IT IS FURTHER ORDERED that Maryland Square LLC's Cross-Motion for Summary

27

28        [18]  The Court denies Maryland Square LLC's cross motion for summary judgment (#863) on this claim.

Judgment (#863) is DENIED.

IT IS FUTHER ORDERED that Shapiro Defendants' Motion to Strike (#874) is DENIED as moot.

IT IS FURTHER ORDERED that NDEP's Motion for Reconsideration of this Court's Minute Order Granting Shapiro Defendants' Motion for Leave to File Surreply (#923) is DENIED.

Dated:  this 17th day of May, 2012.

United States District Judge

24